**UNITED STATES of America**

v.

**Vincent PANETTA, aka Tippy Panetta, Charles Diana.**

**Crim. No. 76–341.**

United States District Court,
E. D. Pennsylvania.

June 24, 1977.

Robert Madden, Philadelphia Strike Force, Philadelphia, Pa., for plaintiff.

Robert F. Simone, Philadelphia, Pa., for Panetta.

Nicholas A. Clemente, Philadelphia, Pa., for Diana.

## OPINION

DITTER, District Judge.

This case comes before the court on post trial motions by defendants who were convicted by a jury of offenses arising out of a felon's purchase of two handguns. Vincent "Tippy" Panetta[1] was found guilty of the unlawful receipt of firearms,[2] the making of false statements,[3] and conspiracy,[4] while Charles Diana was found guilty of conspiracy. Panetta contends his motion for severance should have been granted and evidence of another crime was improperly received. Diana asserts his double jeopardy rights were prejudiced, and both Panetta and Diana contend there was undue pre-trial delay. I find their arguments to be unavailing and therefore their motions must be denied.

■ Viewed in the light most favorable to the government,[5] the evidence adduced at trial established that on two occasions in August, 1974, Panetta, a felon, purchased a handgun from Diana, a federally licensed gun dealer, and that on each occasion false information was listed in the federal forms required to be completed incident to the sale. At the outset of trial the jury was read stipulations which eliminated the need for the government to offer proof on certain elements of the crimes charged. First, it was agreed that prior to the dates of the

1. As the discussion which follows will indicate, there are two Vincent Panetta's involved in this case, the defendant Vincent "Tippy" Panetta, and his cousin, Vincent J. Panetta. To avoid confusion, the defendant will be referred to as "Tippy Panetta" or just "Panetta" and the cousin will be referred to as "Vincent J. Panetta" or "the cousin."

2. In violation of 18 U.S.C. § 922(h)(1) which makes it a crime for anyone convicted of an offense punishable by imprisonment for more than one year to receive any firearm which has been transported in interstate commerce.

3. In violation of 18 U.S.C. § 1001 which prohibits the making of false declarations—here in connection with the purchase of the firearms.

4. In violation of 18 U.S.C. § 371.

5. Even though the defendants do not now seriously urge that the evidence was insufficient to support their convictions, they did raise this argument initially in their motions for judgment of acquittal. I therefore apply the standard appropriate to such motion in reviewing the evidence. See *U. S. v. Giuliano*, 263 F.2d 582, 584 (3d Cir. 1959); 2 *C. Wright, Federal Practice and Procedure* § 467 (1969). As the facts recited in the text reveal, there was more than ample evidence to support the defendants' guilt beyond a reasonable doubt.

alleged transactions the two handguns in question had been shipped to Pennsylvania in interstate commerce. See *Barrett v. United States*, 423 U.S. 212, 96 S.Ct. 498, 46 L.Ed.2d 450 (1976); Cf. *Scarborough v. United States*, —— U.S. ——, 97 S.Ct. 1963, 52 L.Ed.2d 582 (1977). Secondly, it was stipulated that on March 2, 1960, Panetta had been convicted in Pennsylvania of burglary, a crime punishable by imprisonment for a term exceeding one year, and that at all times between August 13 and 27, 1974, Panetta was consciously aware of his prior conviction.

The government's chief witness was Kathleen Colligon, who had been Panetta's girlfriend at the times in question. Colligon testified that sometime in August, 1974, Tippy Panetta, the defendant, requested that she lend him her driver's license for use as identification in buying a gun from Diana, who owned a gun shop located in the basement of his home in Abington, Pennsylvania. Although she had reservations about doing so, Colligon allowed Panetta to take her license. When Panetta returned from the gun shop, Colligon observed that he had a handgun with him. Panetta told Colligon that he had not used her driver's license to buy the gun, but she later saw a bag from Diana's shop in Panetta's car. Attached to the bag was a receipt made out in Colligon's name. Panetta explained this by saying Colligon's name was on the receipt only, and that she had nothing to worry about.

Sometime later that month, August, 1974, Colligon accompanied Panetta to Diana's shop where Panetta exchanged the gun he had purchased for a different model. While at the store Colligon observed an index card record of the original purchase and noted that it listed her name and an address at which she had formerly resided. When questioned, Panetta told her that that card had never been sent (to the appro-

priate authorities) and that the gun was not registered in her name. Diana, who was present, did not disagree with this explanation. Colligon watched Panetta fill out the application for the second gun using the name and address of his cousin, Vincent J. Panetta, Roslyn, Pennsylvania, who was not then present in the shop. Colligon stated that in August, 1974, she and Tippy Panetta resided at the Woodbridge Mews Apartments in Northeast Philadelphia, and that his driver's license contained the address of his sister, 112 Hermit Street, Philadelphia.

The various state and federal forms required to be completed in connection with the transfer of the firearms in question were introduced in evidence. Federal Form 4473 (Exhibit G–1) and the state "Record of Sale of Firearms" (G–3) for the first gun, a Charter Arms .38 special calibre revolver, serial 149842, were dated August 14, 1974, and August 19, 1974, respectively, and were made out to show that the buyer was Colligon. The 4473 also certified that the buyer had never been convicted of a crime punishable by imprisonment for a term exceeding one year. Colligon testified that she had never purchased a gun from Diana, that she never asked Panetta to purchase a gun for her, and that Panetta never told her he had purchased a gun for her. She examined the signatures of the purported buyer on G–1 and G–3 and stated they were not hers.[6] She also noted that her last name in these signatures had incorrectly been spelled "COLLGAN" and that the state form (G–3) listed her eye color as blue when in fact her eyes are brown.[7]

The defendant's cousin, Vincent J. Panetta, testified that he had never purchased a gun from Diana and in fact had never even met Diana prior to December, 1975. Federal Form 4473 (G–2) and the state "Record of Sale of Firearm" form (G–5) for the second gun, a Smith and Wesson Model 49

---

6. Colligon also had given handwriting exemplars which were introduced in evidence for comparison purposes.

7. Colligon related that after accompanying Panetta to the gun shop she did not see Diana

again until April, 1975, when he came to the home where she and Panetta lived in Cherry Hill, New Jersey. On this occasion Diana advised her and Panetta that the FBI might contact her about the first gun.

revolver calibre .38 special, serial J206823, were dated August 26 and August 30, 1974, respectively.[8] The 4473 listed the buyer as "Vincent Panetta, 1364 Beachwood St., Roslyn, Pa., height: 5′9½″, weight: 180, date of birth: 7–20–30, driver's license number: 04986329," and certified that the buyer had never been convicted of a crime punishable by imprisonment for a term exceeding one year. Vincent J. Panetta examined these documents and testified that he had not signed them; that his address is 1364 Birchwood (not Beachwood); his date of birth is January 23, 1922 (not July 20, 1930); his height is 5′6″ (not 5′9″); his weight is 155 pounds (not 180); and his driver's license number is 04402789 (not 04986329).[9]

Special Agent Christopher Mazzella of the FBI testified that during an interview Diana stated he had sold the first gun to Colligon on August 14, 1974, and had personally witnessed her sign form 4473 (G–1). He submitted the form to the authorities, got no response, and several days later Colligon came back and picked up the gun. Sometime around August 26, 1974, Colligon returned this gun to Diana. He refunded her money and a few days thereafter sold it

to someone else. With respect to the second gun, Diana stated that he had sold it to Vincent J. Panetta on August 26, 1974, and had witnessed him sign the 4473 (G–2). Special Agent Clifford Cormany testified to hearing Diana state that he had taken the descriptive information used in G–2 from the driver's license of Vincent J. Panetta.[10] At the agent's request, Diana turned over to Mazzella the 4473's for both guns (G–1 and G–2); he did not give Mazzella his copies of the state forms,[11] although he told Mazzella that he had provided the agent with all his records on the guns in question.

Handwriting exemplars taken from Panetta (G–9 (1–46) and G–12) and Diana (G–11 and G–11A) were introduced in evidence. Special Agent Philip E. Dennis, Jr., of the FBI, who took the exemplars from Panetta, testified that when the defendant was asked to write "Kathy Colligon" he spelled the last name "COLLGAN," the spelling found in the buyer's signature on G–1 and G–3. On the basis of a comparison with the known handwriting of Panetta and Diana, FBI Special Agent Luther Senter, a handwriting expert, testified that the signature of the seller on G–1 and G–5 was the genu-

---

**8.** The government also introduced exhibit G–4, a state "Application for Purchase of Firearms" form for the second gun. This form was dated August 26, 1974, and contained the same descriptive information as G–2 and G–5. Special Agent Keith Rossman of the Bureau of Alcohol, Tobacco and Firearms testified that under state practice this form is to be completed at the time of purchase of the firearm. One copy is then sent to the county sheriff, one copy to the Pennsylvania state police, and the dealer keeps a copy. The dealer may deliver the handgun to the buyer 48 hours after the sale unless he receives notice to the contrary from the authorities. See 18 C.P.S.A. §§ 6110, 6111; *United States v. Davis*, Crim. No. 76–590 (E.D.Pa. May 20, 1977) (Broderick, J.). The "Record of Sale of Firearms" form is to be completed at the time of actual delivery of the gun. It will be noted that the government did not introduce an "Application for Purchase of Firearms" form for the first gun.

According to Rossman the federal Form 4473 is supposed to be dated with the date the firearm is actually transferred to the buyer. See *United States v. Messner*, 428 F.Supp. 538 (E.D.Pa.1977). In the case of both guns involved in this action therefore, the dates on the

two 4473's (G–1 and G–2) should have, but did not, match the dates on the two "Record of Sale of Firearms" forms (G–3 and G–5). On the basis of all the evidence the jury readily could have concluded that the two firearms in question were actually transferred to Panetta on August 14 and 26, 1974, respectively and that the dates on G–3 and G–5 were designed to cover-up the failure to comply with the state waiting period requirement.

**9.** Government exhibit G–6, a certified copy of Tippy Panetta's driver's license, revealed that the license number listed on G–2 was in fact defendant Panetta's real driver's license number. G–6 also showed that Panetta's actual date of birth is July 20, 1926.

**10.** Presumably Cormany heard Diana make this statement while testifying at his earlier perjury trial. See the discussion *infra* at page 120, *et seq.* The jury in the case *sub judice* of course was not told that this was how Cormany had come to overhear the statement.

**11.** The government obtained G–3 from the Pennsylvania state police and G–4 and G–5 from the Montgomery County, Pennsylvania, Sheriff's office.

ine signature of Diana [12] and that the writer of the purchaser's signature on G–2, 3, 4, and 5 was the defendant, Tippy Panetta. With respect to the Kathy "COLLGAN" signature on the Form 4473 for the first gun (G–1), Senter stated that he did not find enough identifying characteristics to reach a definite conclusion that it had been written by Panetta. However, while Senter could not be "100% positive" of the writer of the Collgan signature on G–1 (as he had been about the writer of the questioned purchasers' signatures in G–2 through G–5) and therefore would not given an opinion, he did state that there were a number of similarities between it and the known handwriting of Panetta and a number of dissimilarities between it and the known handwriting of Colligon.

Testimony offered by the defendants hardly aided their cause. First they called to the stand Special Agent Keith Rossman of the Bureau of Alcohol, Tobacco and Firearms, who testified that Diana's firearms acquisition-disposition book contained two sets of interrogatories for the second gun. In addition to the one showing the gun's being received from a wholesaler on April 12, 1974, and sold to Vincent J. Panetta on August 26, 1974, there was a later entry showing this same gun being received from Vincent J. Panetta on March 17, 1974, and sold to one Joseph Allen on May 10, 1975. Rossman also stated that the government made no effort to contact Allen about this transaction. Whatever benefit might have inured to the defendants from this testimony was quickly dissipated when Rossman explained on cross examination that the acquisition-disposition book was kept in chronological order as firearms were received by Diana and that the entry showing receipt of the second gun on March 17, 1974, was grossly out of order, thus giving rise to the possible inference that this entry had been deliberately falsified to cover up the defendants' unlawful activities.[13]

The only other defense witness was Carl Bear, a friend of Diana's who is a gun dealer and is also in the roofing and siding business. Bear testified that during late August, 1974, he was putting aluminum siding on Diana's house when he was introduced to Panetta and Colligon and accompanied them and Diana into the basement gun shop where the quartet talked generally about firearms. Bear stated that he was in the presence of Panetta and Colligon from the time they entered the gun shop until they left the premises and that he saw neither of them come or go with any firearms or sign any papers. To rebut Bear's testimony that no weapons had been transferred on the day Panetta and Colligon were at the gun shop, the government recalled Agent Rossman who related that Diana's own firearms acquisition-disposition book (G–10) showed that the first gun had been returned to him by Colligon on August 26, 1974.[14]

---

12. Whether through design or oversight the government did not elicit from Senter, his opinion as to whether the signatures of Diana on G–2, 3 and 4 were genuine. The defendants, however, never bothered to bring this slight gap in the proof to the attention of the jury.

13. There is another possible explanation of the second acquisition-disposition entry. It is one of several giving March *1974* acquisition dates that are contained in the middle of a list of 197 *5* acquisition entries. But the *month* and *day* of these entries do fit into the normal progression of the other entries—only the year is out of sequence. Thus, it is possible that the explanation for these seemingly erroneous entries was that Diana inadvertently entered the year 1974 instead of 1975 on the record book. Defense counsel never brought this possibility to the attention of the jury. However, doing so would not have materially aided the defense. It would not have reconciled the cousin's testimony that he never bought a gun from Diana or even met him before December, 1975. Accepting the proposition that acquisition date for the second entry was really March 17, *1975*, the jury might well have believed that Tippy Panetta also returned the second gun and that Diana thereafter re-sold it to Allen.

14. Rossman also testified to a conversation Bear initiated with him in the corridor outside the courtroom on the day before Bear was to testify. Bear and Rossman, who knew each other beforehand, were engaged in unrelated conversation when Bear mentioned in connection with his testimony in the instant case that, "It's hard for me to remember. It happened so long ago." At this point Rossman advised Bear that it was improper for them to discuss the

## DOUBLE JEOPARDY

Diana's initial double jeopardy argument is straightforward. Prior to the instant trial, he had been convicted of making false declarations to a grand jury concerning certain of the gun transactions at issue here. Diana asserts his prior conviction bars his being prosecuted under the present indictment.[15] I disagree.

 The double jeopardy clause protects against successive prosecutions for the same offense. See *Ashe v. Swenson*, 397 U.S. 436, 450–51, 90 S.Ct. 1189, 1198, 25 L.Ed.2d 469 (1970) (Brennan, J., concurring). In *Blockburger v. United States*, 284 U.S. 299, 304, 52 S.Ct. 180, 182, 76 L.Ed. 306 (1932), the Supreme Court explained that the "test to be applied to determine whether there are two offenses or only one is whether each [charge] requires proof of an additional fact which the other does not." See also *Ashe*, supra, 397 U.S. at 468, 90 S.Ct. at 1204 (Burger, C. J., dissenting); *United States v. Cala*, 521 F.2d 605, 607 (2d Cir. 1975). Under this "same evidence" standard it is clear that Diana was not prosecuted twice for the same offense. In order to convict Diana at his first trial, the government had to prove he knowingly made a false, material declaration before the grand jury. See *United States v. Lardieri*, 497 F.2d 317, 319–20, rev'd in part on other grounds on reh. before original panel, 506 F.2d 319 (3d Cir. 1974). The essence of the conspiracy charge, on the other hand, was the unlawful agreement between Diana and Panetta to transfer firearms from the former to the latter. In order to sustain a conviction of conspiracy it is necessary for the government to prove "an agreement among the conspirators to commit an offense attended by an act of one or more of the conspirators to effect the object of the conspiracy." *United States v. DeCavalcante*, 440 F.2d 1264, 1272 (3d Cir. 1971), quoting *United States v. Falcone*, 311 U.S. 205, 210, 61 S.Ct. 204, 207, 85 L.Ed. 128 (1940). While the false testimony giving rise to the perjury charge related to the same subject matter as the object of the conspiracy, the sale of firearms from Diana to Panetta, this does not make the offenses the same for double jeopardy purposes. *In re Bonk*, 527 F.2d 120, 126 (7th Cir. 1975); see *Pinkerton v. United States*, 328 U.S. 640, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946); *United States v. Pappas*, 445 F.2d 1194, 1198 (3d Cir.), cert. denied sub nom., *Mischlich v. United States*, 404 U.S. 984, 92 S.Ct. 449, 30 L.Ed.2d 368 (1971). The "same transaction test" espoused by Justices Brennan, Marshall, and Douglas in *Ashe*, and under which Diana's reprosecution for conspiracy would arguably be barred, is not a constitutional imperative, *United States v. Marshall*, 513 F.2d 274, 276 (5th Cir. 1975), cert. denied, 423 U.S. 1048, 96 S.Ct. 773, 46 L.Ed.2d 636 (1976), and has not been adopted as the law of this Circuit, *United States ex rel. Brown v. Hendrick*, 431 F.2d 436, 440 (3d Cir. 1970), cert. denied, 402 U.S. 976, 91 S.Ct. 1677, 29 L.Ed.2d 141 (1971).

 Diana next argues that the collateral estoppel aspect of the double jeopardy clause as enunciated in *Ashe*, supra, precludes relitigation here of an ultimate fact (whether Diana sold a gun to Panetta) which was necessarily decided in the perjury trial. In making this argument defendant has overlooked a crucial distinction between the present situation and that presented in *Ashe*: in *Ashe* the defendant

---

case and they returned to their discussion of other matters. With respect to Bear's difficulty in remembering what happened, it should be noted that in her testimony Colligon stated that when she and Panetta went to Diana's gun shop on August 26, 1974, there was someone else in the store, but that Diana took care of that person and he left the store before Panetta had any dealings with Diana.

**15.** On September 8, 1975, Diana appeared before the grand jury investigating various alleged criminal activities of Panetta and testified *inter alia*, that he had sold a gun to Colligan and that Colligon personally had signed the federal firearms form. Based on this testimony Diana was indicted for violation of 18 U.S.C. § 1623 on November 15, 1975, at Criminal No. 75–691. He was convicted of that offense on January 12, 1976, in a trial before the Honorable Charles R. Weiner of this court. The instant indictment followed on June 16, 1976.

had been *acquitted* in the prior proceeding whereas here Diana was convicted at his prior trial. As the Eighth Circuit noted in *Moton v. Swenson*, 488 F.2d 1060, 1062 (1973), cert. denied, 417 U.S. 957, 94 S.Ct. 3086, 41 L.Ed.2d 675 (1974), "prior acquittal was the linchpin of the *Ashe* decision . . . ." See also *Pulley v. Norvell*, 431 F.2d 258 (6th Cir. 1970), cert. denied, 401 U.S. 916, 91 S.Ct. 896, 27 L.Ed.2d 817 (1971), wherein the court observed:

It is significant that *Ciucci v. Illinois*, 356 U.S. 571, 78 S.Ct. 839, 2 L.Ed.2d 983, decided the same day as *Hoag* [*Hoag v. New Jersey*, 356 U.S. 464, 78 S.Ct. 829, 2 L.Ed.2d 913] was not overruled by *Ashe*. In *Ciucci* a man was accused of killing his wife and two children by shooting them and leaving them in a burning building. He was tried in three separate trials and convicted each time of first degree murder. The Court affirmed the convictions upon the same basis as *Hoag* but with the factual distinction that in *Ciucci* the defendant was convicted at the earlier trial while the defendant in *Hoag* was acquitted. We construe *Ashe* to recognize a distinction between a case where the defendant is convicted in trial one of a crime against *A* and in trial two of a crime occurring the same time against *B*, and the situation where at the first trial one of the defendants is acquitted of a crime against *A* under circumstances that the defendant's presence or absence at the scene of the crime is resolved in favor of the accused.

*Id.* at 261. Indeed, in view of Diana's prior conviction, a logical application of the collateral estoppel doctrine would require that the issue of whether he had sold a firearm to Panetta be conclusively resolved against him in the present case. This, of course, would be the same as a partially directed verdict of guilty and clearly would infringe upon Diana's constitutionally protected right to a jury trial. See 2 *C. Wright, Federal Practice and Procedure* § 461, at 242 (1969), and cases cited therein.

UNDUE PRETRIAL DELAY

Both Panetta and Diana contend that their convictions should be set aside because of undue delay in bringing them to trial. In *United States v. Marion*, 404 U.S. 307, 314–15, 92 S.Ct. 455, 460, 30 L.Ed.2d 468 (1971), the Supreme Court held that the sixth amendment right to a speedy trial does not protect against pre-accusation delay. "It is either a formal indictment or information or else the actual restraints imposed by arrest and holding to answer a criminal charge that engage the particular protections of the speedy trial provision of the Sixth Amendment." *Id.* at 320, 92 S.Ct. at 463. However, while recognizing that "the applicable statute of limitations is the primary guarantee against bringing overly stale criminal charges," *id.* at 322, 92 S.Ct. at 464, the *Marion* court also held that the due process clause of the fifth amendment was available to protect an accused from pre-indictment delay "if it were shown at trial that [such delay] caused substantial prejudice to [the accused's] right to a fair trial *and* that the delay was an intentional device to gain tactical advantage over the accused." *Id.* at 324, 92 S.Ct. at 465 (emphasis added).

As noted previously the events giving rise to this case took place in August of 1974, Diana was indicted for perjury on November 15, 1975, the instant indictment was returned on June 16, 1976, and trial of this case commenced on September 8, 1976.

It is necessary initially to determine at what point Diana became an "accused" *in this case* for purposes of activating his speedy trial rights. In *United States v. DeTienne*, 468 F.2d 151, 155 (7th Cir. 1972), cert. denied, 410 U.S. 911, 93 S.Ct. 974, 35 L.Ed.2d 274 (1973), the defendants had been arrested on various unrelated charges prior to their indictment for attempted bank robbery. The court rejected the defendants' argument that their speedy trial rights with respect to the bank robbery indictment should be measured from the date of their arrests on the unrelated charges. "It would be absurd in the extreme if an arrest on one charge triggered the Sixth Amendment's speedy trial protection as to prosecutions for any other chargeable offenses." *Id.* at 155. However, the court went on to note:

Of course, if the crimes for which a defendant is ultimately prosecuted really only gild the charge underlying his initial arrest and the different accusatorial dates between them are not reasonably explicable, the initial arrest may well mark the speedy trial provisions applicability as to prosecution for all the interrelated offenses.

*Id.* Whatever the exact perimeters of when an ultimate prosecution may be said to "really only gild" an initial accusation,[16] it is clear that in this case the indictment of Diana for conspiracy did not merely gild his earlier indictment for perjury.

▮ The perjury indictment stemmed from Diana's individual conduct before the grand jury sitting in Philadelphia in September of 1975, whereas the indictment *sub judice* charged both Panetta and Diana, involved conduct which took place over a year earlier in August, 1974, and centered around Diana's Abington, Pennsylvania, gun shop. The fact that there is an underlying relationship between the two indictments does not mean that Diana became an accused for purposes of the latter when he was prosecuted under the former. See *United States v. Stoker*, 522 F.2d 576, 580 (10th Cir. 1975); *United States v. Mejias*, 417 F.Supp. 585, 591 & n. 6 (S.D.N.Y.1976); *United States v. Clark*, 398 F.Supp. 341, 349 & n. 3 (E.D.Pa.1975), aff'd mem., 532 F.2d 745, 746 (3d Cir. 1976). I therefore conclude that Diana's speedy trial guarantee in this case was not activated prior to the date the indictment was returned, June 16, 1976. Of course this same date governs the activation of Panetta's speedy trial right since he was not charged in Diana's earlier perjury

indictment and the speedy trial clause extends only to those actually accused in a criminal prosecution. *United States v. McClure*, 153 U.S.App.D.C. 370, 371, 473 F.2d 81, 82 (1972); *Mejias*, supra, 417 F.Supp. at 591 n. 6. Since the less than 90 day interval between the return of this indictment and the commencement of trial, some of which resulted from consideration of defendants' pre-trial motions, is well within normal limits, it is apparent that the speedy trial rights of neither defendant were violated. See, e. g., *Stoker*, supra, 522 F.2d at 580–81. The defendant's undue delay argument therefore must be predicated entirely upon the pre-accusation interval from the date of the offense, August of 1974, to the date of indictment, June 16, 1976, a period of roughly twenty-two months.

Despite the rather clear language of *Marion* (see page 122, supra), prior to the Supreme Court's recent decision in *United States v. Lovasco*, —— U.S. ——, 97 S.Ct. 2044, 52 L.Ed.2d 752 (1977), there was some question as to whether a successful due process claim for pre-accusation delay required a showing of *both* intentional prosecutorial delay for tactical reasons or harassment *and* substantial prejudice to the defendant's right to a fair trial or whether either factor above is sufficient. Compare *United States v. Frumento*, 405 F.Supp. 23, 27–28 (E.D.Pa.1975), with *United States v. Clark*, supra, 398 F.Supp. at 350. *Lovasco* makes it clear that both prejudice and some unjustifiable reason for the delay must be present before pre-accusation delay can amount to a due process violation. —— U.S. at ——, ——, 97 S.Ct. 2044.[17]

---

16. A case which clearly seems to have been contemplated by the quoted comment is *United States v. Cabral*, 475 F.2d 715 (1st Cir. 1973). In that case authorities arrested the defendant for possession of a sawed-off shotgun, although the officers' investigation was aimed at determining if he was dealing in parts from a stolen automobile. After the arrest the officers confirmed that the defendant did have a stolen vehicle and he was eventually charged with grand larceny, but this state charge was ultimately dismissed. Three days after defendant's arrest, the shotgun was turned over to

federal authorities who waited fifteen months to seek an indictment under 26 U.S.C. § 5861(i). In view of the substantial identity of the offense charged when the defendant was initially arrested and that contained in the federal indictment the court concluded that the speedy trial guarantee attached at the time of the arrest.

17. In *Lovasco* the court did not decide the question of what kinds of delays might be deemed unjustifiable, thus leaving open the possibility that reasons other than harassment on the attainment of a tactical advantage might

**124**

■ At the pre-trial hearing on this issue, the government candidly admitted that in all probability it could have obtained the instant indictment when it obtained the earlier indictment against Diana. Counsel represented that the reason for not doing so was that the government was looking into the possibility of bringing other charges against the defendants and had not yet completed its investigation of their criminal activities.[18] Despite the defendants' bald assertion that the government's delay in bringing the instant indictment was a tactical device designed to afford it the opportunity for a "dry run" trial to "iron the kinks out of its case," they have offered no evidence to refute the government's representations. False testimony before the grand jury seriously hinders that body's vital investigative function. Cf. *United States v. Calandra*, 414 U.S. 338, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974). It was not unreasonable for the government to protect its interest in unimpeded grand jury investigations by seeking the indictment against Diana for making a false declaration without at the same time seeking indictments on the substantive violations which were the subject of a specific investigation. I conclude that the pre-accusation delay in this case was not motivated by the government's desire to obtain a tactical advantage over the defendants.

Diana contends that delaying the instant indictment until after his perjury conviction prejudiced him because he could be impeached at this trial by that conviction.

■ Since the government is not required to join in one prosecution all charges growing out of the same transaction,[19] there would appear to be some question as to whether possible impeachment-use of an earlier conviction—a factor which may exist in most cases where the government chooses to exercise its option of bringing successive prosecutions—can ever be sufficient to satisfy the prejudice aspect of *Marion*.[20] Of course, the deliberate segmentation of a criminal prosecution for this purpose[21] might well be considered prosecutorial misconduct which, combined with resulting prejudice, would be sufficient to establish a due process violation. I need not decide these difficult questions in this case because, despite ample opportunity to do so, Diana never represented at the pre-trial hearing or during trial that he would testify in his own behalf were it not for the possibility of being impeached by his prior conviction. In the absence of such a showing, Diana's claim of prejudice is entirely too speculative to meet the substantial prejudice test of *Marion*. See *Clark*, supra, 398 F.Supp. at 351; cf. *United States v. Cox*, 428 F.2d 683, 689 & n. 4 (7th Cir.), cert. denied, 400 U.S. 881, 91 S.Ct. 127, 27 L.Ed.2d 120 (1970); *United States v. Frumento*, 409 F.Supp. 143, 145–46 (E.D.Pa. 1976).

■ Panetta contends that he was prejudiced because the Federal Rules of Evidence, which became effective on July 1, 1975, in the interim between the commis-

satisfy this aspect of the test. —— U.S. at ——, 97 S.Ct. at 2052 & n. 19.

**18.** The government's continued investigation into other aspects of Panetta's activities that were unrelated to this case apparently proved fruitful. See *United States v. Panetta*, Crim. No. 76–393 (E.D.Pa. filed June 9, 1977) (Fullam, J.)

**19.** Compare the majority and concurring opinions in *Ashe*, supra.

**20.** Under Federal Rule of Evidence 609(a) if the earlier conviction is for a felony not involving dishonesty or false statement, the court has discretion to exclude its use for impeachment purposes and by so doing may alleviate this as a factor under the prejudice aspect of *Marion*.

See *Clark*, supra, 398 F.Supp. at 351. However, Rule 609(a) forecloses the trial judge's discretion to exclude when the prior conviction is for a crime involving dishonesty or false statements. Whether, despite the mandatory language of the Rule, a court may nonetheless opt to exclude a prior *crimen falsi* conviction when (and *if*) necessary to alleviate a *Marion* prejudice claim is an issue I also need not reach in this case.

**21.** Diana does not claim that the government's *purpose* in bringing separate indictments against him was to use his anticipated perjury conviction as added leverage against him in the conspiracy trial.

sion of the offense and the return of the indictment, abrogated the husband-wife privilege which would have prevented Colligon's testifying against him. This claim is apparently predicated on the argument that Colligon was Panetta's common-law wife at the time of the offense. There are two answers to this assertion of prejudice. In the first place, the Federal Rules of Evidence did not meaningfully alter the prior rules of privilege in federal criminal cases. See 2 *Weinstein's Evidence* § 501[02] at 18 (1975). Rule 501 of the Federal Rules of Evidence specifically preserves the prior Fed.R.Crim.P. 26 practice under which the question of spousal privilege in a federal criminal case is governed by principles of federal common law. See *Funk v. United States*, 290 U.S. 371, 54 S.Ct. 212, 78 L.Ed. 369 (1933); *United States v. Woodall*, 438 F.2d 1317, 1327 (5th Cir. 1970), cert. denied, 403 U.S. 933, 91 S.Ct. 2262, 29 L.Ed.2d 712 (1971). And on the basis of such principles the Supreme Court in *Hawkins v. United States*, 358 U.S. 74, 79 S.Ct. 136, 3 L.Ed.2d 125 (1958), sustained the privilege of an accused to prevent his spouse from testifying against him.

 Turning to the merits of the spousal privilege claim, it is apparent that Panetta failed to show it was applicable in this case. See *United States v. Lewis*, 363

F.Supp. 614, 619 (W.D.Pa.1973). While federal law governs the application of the privilege, the question of who is a spouse depends on the law of the domiciliary. *Weinstein*, supra § 505[03] at 14–15, citing *United States v. McElrath*, 377 F.2d 508, 510 (6th Cir. 1967), cert. denied, 395 U.S. 915, 89 S.Ct. 1764, 23 L.Ed.2d 229 (1969). Panetta made no effort to show that his relationship with Colligon satisfied the requisites for a valid Pennsylvania common-law marriage.[22] See *Commonwealth v. Clanton*, 395 Pa. 521, 528, 151 A.2d 88 (1959). As the court noted in *Lewis*, supra:

> The test of whether a valid marriage existed is not whether the parties to an allegedly lawful marriage believe they are lawfully married, but whether in law they are lawfully married.

363 F.Supp. at 619.[23]

Finally both defendants make the general allegations that they were prejudiced because the passage of time between the offense and the indictment clouded the memories of witness and hampered their ability to reconstruct what had happened. But this is precisely the type of conclusory allegation which the *Marion* court held insufficient to make out a due process claim:

> Appellees rely solely on the real possibility of prejudice inherent in any extended delay: that memories will dim, witnesses

---

**22.** As the record reveals, see N.T. 2–40 through 2–49, prior to trial Panetta had withdrawn his claim of spousal privilege. At the conclusion of Colligon's direct testimony the government turned over, pursuant to the Jenks Act, a statement given by her to the FBI. After reviewing this statement Panetta's counsel moved for dismissal on the ground that Colligon had stated therein that she and Panetta had lived together in Cherry Hill, New Jersey, as husband and wife and that the statement therefore should have been turned over to counsel before he made his decision to withdraw the privilege claim. Counsel for the government countered that the government had never denied that Colligon and Panetta had lived together in New Jersey. He offered to excuse the jury and immediately relitigate the privilege question by examining Colligon about her relationship with Panetta. Counsel for Panetta did not accede to this suggestion but merely reiterated his motion to dismiss. I refused this, but offered Panetta the opportunity to pursue the privilege question at a more convenient point in the trial.

Panetta never raised the matter again until he filed his post-trial motions.

Since Panetta and Colligon were living in New Jersey at some point, it should be noted that common law marriages have been invalid in that state since 1939. See N.J.S.A. § 37:1–10.

Moreover, there is an obvious distinction between living *as* husband and wife and being husband and wife.

**23.** The defendant's privilege claim is made in such conclusory fashion that it is impossible to determine whether he relies on the privilege which makes a person incompetent to testify against his spouse *at all* (see *McCormick on Evidence* § 66 (2 ed. 1972)) or the privilege for confidential marital communications (*McCormick*, supra, Ch. 9). In any event Panetta's failure to establish that a marital relationship ever existed between himself and Colligon precludes reliance on either privilege. See *McCormick* § 81.

become inaccessible, and evidence be lost. In light of the applicable statute of limitations, however, these possibilities are not in themselves enough to demonstrate that appellees cannot receive a fair trial and to therefore justify the dismissal of the indictment.

404 U.S. at 325–26, 92 S.Ct. at 466. The events of the trial also failed to demonstrate that the defendants suffered any actual prejudice from the delay. *Id.* Their rights under the due process clause therefore were not violated.

SEVERANCE

 Panetta contends that the court erred in refusing a severance so that he could call co-defendant Diana to the stand and seek exculpatory testimony. The general rule is that defendants jointly indicted should be jointly tried. *United States v. Kulp*, 365 F.Supp. 747, 765 (E.D.Pa.1973), aff'd mem., 497 F.2d 921, 922 (3d Cir. 1974). A defendant seeking severance bears the burden of clearly showing that severe prejudice will result from a joint trial. *United States v. Frumento*, supra, 409 F.Supp. at 144–45; see *United States v. Lipowitz*, 407 F.2d 597, 601–02 n. 15 (3d Cir.) cert. denied, 395 U.S. 946, 89 S.Ct. 2026, 23 L.Ed.2d 466 (1969). Since a defendant cannot compel his untried co-defendant to testify regardless of whether they are tried jointly or separately, *United States v. Barber*, 442 F.2d 517, 529 n. 22 (3d Cir.), cert. denied, 404 U.S. 958, 92 S.Ct. 327, 30 L.Ed.2d 275 (1971), in order to obtain a severance on this basis Panetta was required to show both that Diana would testify voluntarily if a joint trial were not held and the signifi-

cance of such testimony to the defense. *Frumento*, supra, 409 F.Supp. at 145. Here Panetta failed to satisfy even the threshold requirement of showing that Diana would testify at all if a severance were granted.

At the pre-trial hearing on the severance motion the best Panetta's counsel could do was to state *his* belief that Diana would testify for Panetta if the defendants were tried separately. This was even less of a showing than made in *Frumento* and for the reasons stated there, I found it totally insufficient to justify a severance.[24]

Panetta renewed his motion on two occasions during the trial. The first time was as an alternative to his objection to the testimony of Special Agent Mazzella concerning the false exculpatory declarations made by Diana during the September 8, 1975, interview. The government's purpose in introducing these declarations was, of course, to show guilty knowledge on the part of Diana. Counsel contended that the introduction of Diana's statements would violate Panetta's confrontation rights as explained in *Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968). I refused to exclude the evidence or grant a severance.

 *Bruton* holds that a defendant's sixth amendment confrontation right is violated if the statement of a nontestifying co-defendant *which inculpates the defendant* is introduced at their joint trial. In summary, the relevant statements of Diana which I permitted the jury to hear through Agent Mazzella were that (1) Diana knew the defendant Panetta (N.T. 2–118); (2) Diana sold a gun (the first gun) to Colligon

---

**24.** Although there was no direct representation by Panetta's counsel on this point, it appears that the exculpatory testimony he expected to be forthcoming from Diana would be merely the repetition of Diana's earlier denials of participation in the crimes charged given in his statement to agent Mazzella and his grand jury and perjury trial testimony. These earlier statements and testimony which tended to exculpate both Panetta *and* Diana are not the equivalent of the co-defendant's statements in *Byrd v. Wainwright*, 428 F.2d 1017 (5th Cir. 1970) or *United States v. Echeles*, 352 F.2d 892 (7th Cir. 1965) which were against the declar-

ant's penal interest. Accordingly they were no substitute for the direct statement by Diana that "he would be willing to offer reasonably precise exculpatory evidence for [Panetta] at a separate trial." *Frumento*, supra, 409 F.Supp. at 146. Moreover, on the question of the significance of the expected testimony, I agree with Judge Bechtle that "a general denial of guilt by a co-defendant is neither sufficiently important to serve as the basis for the granting of a severance nor to presume prejudice to a defendant due to his inability to offer it." *Id.* at 147.

on August 14, 1974 (N.T. 2–121); and (3) Diana sold a gun (the second gun) to the cousin, Vincent J. Panetta, on August 26, 1974. Unlike the situation in *Bruton*, the above statements tended to exculpate rather than inculpate Panetta.[25] Moreover on three occasions while these statements were being presented, I instructed the jury that their value, if any, was only with respect to Diana and that they were not to be considered as evidence against Panetta. See N.T. 2–117, 121, 134. Under these circumstances, the failure to exclude the statements or grant a severance did not violate Panetta's sixth amendment rights. *United States v. Tropiano*, 418 F.2d 1069, 1080–81 (2d Cir. 1969), cert. denied, 397 U.S. 1021, 90 S.Ct. 1262, 25 L.Ed.2d 530 (1970); see *United States v. Lipowitz*, 407 F.2d 597, 602 (3d Cir.), cert. denied sub nom. *Smith v. United States*, 395 U.S. 946, 89 S.Ct. 2026, 23 L.Ed.2d 466 (1969).

Panetta renewed his motion for severance after Diana had completed presenting his case. Counsel reiterated that he wished to call Diana as a witness in Panetta's defense[26] and asked for a severance in order to do so. At counsel's request the jury was excused and Diana was called to the stand to determine under what, if any, conditions he would testify. Diana emphatically stated that he would not testify even if a severance were granted (N.T. 4–4).[27] Since it was now clear that Diana would not assist Panetta I refused the severance. See *Frumento*, supra. Panetta's counsel then took a different tack. He requested a severance be granted so he might call Diana, force him to invoke his fifth amendment privilege, and then comment to the jury on his co-defendant's silence.[28] I also refused to grant a severance on this basis because there was no showing that Panetta's inability to comment would

**25.** The government also sought to elicit from Mazzella that Diana had stated Panetta was in his gun shop with Colligon when she purchased the first gun. I refused to allow this testimony, see N.T. 1–50, 51, because it was inculpatory in the sense that it put Panetta in the shop where the alleged crime was committed. See *Harrington v. California*, 395 U.S. 250, 89 S.Ct. 1726, 23 L.Ed.2d 284 (1969).

Arguably even Diana's declaration that he *knew* Panetta (N.T. 2–118) had some inculpatory effect and should have been excluded under *Bruton*. However, if the admission of this declaration was error, it was harmless in view of the other overwhelming evidence that Panetta and Diana were acquainted. Not only did Colligon testify to this effect but her testimony was corroborated by Agent Senter's conclusion that both men's signatures appeared on the same documents. See *Schneble v. Florida*, 405 U.S. 427, 92 S.Ct. 1056, 31 L.Ed.2d 340 (1972); *Harrington*, supra.

**26.** Counsel stated that he wished to question Diana as to whether Panetta had filled out certain parts of G–1 and G–2 other than the purchaser's signature (i. e.; the portions requiring descriptive information (height, weight, race, etc.) and the affirmation that the purchaser had never been convicted of a felony) and represented his belief that Diana would say Panetta had not done so, thus tending to exculpate Panetta of the Section 1001 violations.

**27.** Counsel also requested that the court grant Diana immunity in order that he might testify for Panetta. Diana stated that if granted a

severance and immunity, he would answer the single question as to who had completed certain portions of G–1 (N.T. 4–5), but would refuse to submit to cross-examination by the government (N.T. 4–6). I refused the request for immunity. Generally, in the absence of a request by the government, which was not made in this case, courts lack authority to grant immunity to a witness. *Thompson v. Garrison*, 516 F.2d 986, 988 (4th Cir.) cert. denied, 423 U.S. 933, 96 S.Ct. 287, 46 L.Ed.2d 263 (1975); *United States v. Berrigan*, 482 F.2d 171, 190 (3d Cir. 1973). Panetta's reliance on *United States v. Morrison*, 535 F.2d 223 (3d Cir.) in which the court ordered the government to choose between granting use immunity to a defense witness or suffering a judgment of acquittal, is misplaced in as much as this case involves no government overreaching, which was the predicate for the *Morrison* court's action.

**28.** Actually counsel announced that he intended to follow this procedure whether or not a severance was granted, unless ordered not to by the court. Since calling Diana to the stand and commenting on his silence in a joint trial would have violated Diana's fifth amendment rights, see *Coleman v. United States*, 137 U.S. App.D.C. 48, 420 F.2d 616, 625 (1969), I, of course, ordered him not to do so. If Panetta's request had had any merit a severance would have been required to implement it.

result in real prejudice to his defense.[29] *United States v. Somers*, 496 F.2d 723, 731 (3d Cir.) cert. denied, 419 U.S. 832, 95 S.Ct. 56, 42 L.Ed.2d 58 (1974). Unlike *DeLuna v. United States*, 308 F.2d 140 (5th Cir. 1962), the interests of the co-defendants here were not mutually exclusive. See *Somers*, supra; *United States v. Addonizio*, 451 F.2d 49, 62–63 (3d Cir.), cert. denied, 405 U.S. 936, 92 S.Ct. 949, 30 L.Ed.2d 812 (1972); *United States v. Kahn*, 381 F.2d 824, 840 (7th Cir.), cert. denied, 389 U.S. 1015, 88 S.Ct. 591, 19 L.Ed.2d 661 (1967). Indeed because of the seller-buyer relationship between Diana and Panetta, adverse comment on the former's failure to testify would have served only to hurt Panetta rather than help him.[30] Cf. *United States v. Carella*, 411 F.2d 729, 731–32 (2d Cir.) cert. denied sub nom., *Erhart v. United States*, 396 U.S. 860, 90 S.Ct. 131, 24 L.Ed.2d 112 (1969).

There was no error in refusing Panetta's various severance motions.

## EVIDENCE OF OTHER CRIMES

During her direct examination, Colligon testified about an unrelated crime allegedly committed by Panetta. Specifically, Colligon said that at Panetta's request she lied to an FBI agent concerning the purchase of a car. Panetta contends that the introduction of this testimony prejudiced his right to a fair trial and that the court should have granted his motion for a mistrial. I cannot agree.

■ The testimony in question was not introduced for the purpose of showing Panetta's propensity to violate the law, but to support Colligon's credibility. Colligon's complete testimony on this point was that she was appearing as a witness for the government under a grant of immunity necessitated by the lie she had told the FBI at the request of Panetta.

■ Although generally credibility may not be supported until it has first been attacked, *McCormick's* supra, § 49, at 102, an exception is recognized which allows the government to bring out on direct examination the circumstances surrounding a witness's motivation for cooperating with the government or other matters damaging to the witness's credibility. See *United States v. Blackwood*, 456 F.2d 526, 529 (2d Cir.) cert. denied, 409 U.S. 863, 93 S.Ct. 154, 34 L.Ed.2d 110 (1972); *United States v. Del Purgatorio*, 411 F.2d 84, 87 (2d Cir. 1969). As explained in *Del Purgatorio*, supra, the purpose of allowing this procedure is that to defer the introduction of evidence damaging to a witness's credibility until it is brought out on cross examination might lead the jury unjustifiably to infer that the government was attempting to conceal something.

■ The need to establish Colligon's credibility was particularly pressing here in view of the strong suggestion of bias which preceded the receipt of any evidence. During his opening statement, Panetta's counsel told the jury that Colligon's testimony would be that of a "scorned woman," implying that she was appearing out of some personal animosity toward the defendant due to the termination of their relationship. It was not improper for the government to rebut this inference of bias by showing what it considered to be the real circumstances behind Colligon's testimony, even if such evidence incidentally tended to suggest the commission of another offense. *Bracey v. United States*, 79 U.S.App.D.C. 23, 142 F.2d 85, 89–90, cert. denied, 322 U.S. 762, 64 S.Ct. 1274, 88 L.Ed. 1589 (1944). See also *Beck v. United States*, 317 F.2d 865, 869–70 (5th Cir. 1963). Moreover, immediately after the challenged testimony was received, I instructed the jurors that its value, if any, was only as an aid to them in assessing Colligon's credibility and that it could not be considered as evidence of Panetta's guilt. See N.T. 2–17. These detailed limiting instructions removed any possible

---

**29.** The lack of prejudice is particularly clear in this case since Panetta never expressed any desire to, nor did he in fact, testify himself.

**30.** Diana's records showed he had not sold a gun to Tippy Panetta, which was also Panetta's

contention. Any adverse comment about Diana's failure to testify would have reflected upon his records and thus upon Panetta's defense.

prejudice that might have resulted from the introduction of the testimony in question. *Del Purgatorio, supra,* 411 F.2d at 87.

### CONCLUSION

I have considered the other assignments of error advanced by the defendants and find them to be without merit. Accordingly the defendant's motions for arrest of judgment, judgment of acquittal and a new trial must be denied.[31]

---

**31.** In a belated "supplemental motion" Panetta asserts two additional grounds for relief. Although this motion is grossly out of time, because both grounds are easily disposed of, I will consider it on the merits. The first argument advanced by Panetta—that Section 922(h) as applied to Panetta's intrastate acquisition of firearms which at some prior time had traveled in interstate commerce is beyond Congress' power under the commerce clause—seems foreclosed by the Supreme Court's decision in *Barrett, supra.* Although the court did not specifically decide the constitutional issue inasmuch as the defendant had conceded Congress' power under the commerce clause, see 423 U.S. at 215, 96 S.Ct. at 501, it is apparent that the court would not have upheld Barrett's conviction had it believed Section 922(h) unconstitutional as applied to him. See also *Scarborough v. United States, supra.* Moreover numerous lower federal courts have held various subsections of Section 922 constitutional in the face of similar constitutional attacks. See, e. g., *United States v. Hornbeck,* 489 F.2d 1325 (7th Cir. 1973), cert. denied 416 U.S. 907, 94 S.Ct. 1614, 40 L.Ed.2d 112 (1974); *United States v. Petrucci,* 486 F.2d 329 (9th Cir. 1973), cert. denied, 416 U.S. 937, 94 S.Ct. 1937, 40 L.Ed.2d 287 (1974); *Mandina v. United States,* 472 F.2d 1110 (8th Cir.) cert. denied, 412 U.S. 907, 93 S.Ct. 2299, 36 L.Ed.2d 972 (1973).

Panetta also complains of the fact that both 18 U.S.C. § 922(h)(1) and 18 U.S.C.App. § 1202(a)(1) punish the receipt of a firearm by a convicted felon, but the former section, under which he was convicted, carries a five year maximum penalty plus a $5,000. fine, while the latter section contains only a two year maximum penalty plus a $10,000. fine. There is no doubt that these two sections of the Gun Control Act do overlap to a considerable extent, particularly in light of the construction given to these sections in *Barrett* and *Scarborough.* However, absent a Congressional scheme limiting its choice of statutes, which is not present here, the government was free to prosecute Panetta under either section of the Act. See *United States v. Phillips,* 522 F.2d 388, 393 (8th Cir. 1975); *Mauney v. United States,* 454 F.2d 273, 274 (6th Cir. 1972).